IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| JOHN ASSATURIAN,<br><br>Plaintiff,<br><br>vs.<br><br>HERTZ CORPORATION; JOHN DOES 1-10; JANE DOES 1-10; and DOE ENTITIES 1-10,<br><br>Defendants. | CIVIL NO. 13-00299 DKW KSC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT THE HERTZ CORPORATION'S MOTION FOR SUMMARY JUDGMENT** |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT THE HERTZ CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Hertz terminated Assaturian for angry outbursts directed toward his subordinates after receiving a warning for similar conduct on a previous occasion. Assaturian counters that he was terminated for conduct associated with various disabilities that Hertz failed to reasonably accommodate. Because the Court must construe the record in the light most favorable to the non-moving party, and because questions of fact persist in several areas, the Motion is DENIED as to Count I's

claim for disability discrimination, punitive damages, and Hertz's request to limit damages based on after-acquired evidence. The Motion is GRANTED with respect to Count II's retaliation claim, Hertz's request to deny back and front pay based on Assaturian's failure to mitigate, and any emotional distress damages incurred after June 6, 2013.

## BACKGROUND

### I. Assaturian's Employment with Hertz and Disability

Assaturian began working for Hertz in 1989. From 2004 until his termination in 2012, he was the Location Manager for Hertz's Car Sales Department in Honolulu. Tison Decl. ¶ 3. In this position, Assaturian oversaw the sales of Hertz's rental cars and supervised several other sales employees. Pl. Dep. Tr. 26-28. Assaturian reported to managers located in California, Arizona, and New Jersey. Tison Decl. ¶ 4. Jamie Tison, the Human Resources Representative for the Car Sales Department since 2003, is located in California. Tison Decl. ¶ 1.

In 2004, Assaturian was diagnosed with Chronic Ulcerative Proctitis and Ulcerative Colitis. In late November 2011, he began receiving treatment for Depression, Dysthemic Disorder and Adjustment Disorder. He claims that these conditions substantially impact his ability engage in one or more major life activities. According to Assaturian, his ability to eat, sleep, concentrate, take care

of himself, exercise, and walk is significantly limited.   Pl. Decl. ¶¶ 4-6.   He claims that:

> The conditions are so severe that I have to wear "Depends" diapers as I cannot control my bowels.   I have to constantly use the bathroom and have had accidents as a result of not having one near me.   I have constant fear that I will have an accident. As a result, I can no longer take long walks, swim, golf, go to the gym, and do yoga, among other activities.   Because I do not sleep well, my ability to handle stress and concentrate is adversely affected.
>
> These longer-term conditions increased my stress, irritability, anxiety and the ability to control my emotions.   The lack of sleep also increased my irritability, which interfered with my ability to calmly perform my essentials duties and to concentrate.

Pl. Decl. ¶¶ 6-7.

According to Hertz, Assaturian engaged in a pattern of inappropriate and disruptive behavior that resulted in discipline over the course of his employment.   Hertz cites a 1998 incident in which he was involved in a loud, verbal confrontation with a subordinate, Bambi Tanaka, in front of employees and customers, during which Tanaka claimed that he used vulgar language that offended and frightened her.   Hertz issued Assaturian a warning on April 17, 1998, explaining that "Subordinates must be supervised, never admonished or reprimanded in front of their peers. . . .   Another emotional outburst in the workplace with anyone will not be tolerated. . . .   Failure to correct the above

concerns will result in further disciplinary action up to and including termination of employment."   Pl. Dep. Ex. 9.

Hertz also cites a March 1, 2008 confrontation between Assaturian and another subordinate, Sales Representative Stacy Holder.   Assaturian acknowledged his inappropriate behavior during the course of Hertz's investigation.   As a result, Hertz issued Assaturian a "final warning" for inappropriate behavior on March 7, 2008, which states in part:

> On March 1, 2008, you were confrontational and used inappropriate behavior towards Stacy Holder.   Stacy Holder stated that when she came into your office to discuss Unit # 7381544, you became angry, stood up and lunged forward at Stacy pounding your fist on the table.   Stacy then stated because of your reaction, she could no longer speak to you because she was frightened and left your office.   By your own admission, you did pound your fist on the table and raised your hand, which made Stacy feel uncomfortable and afraid.   As the Location Manager, you are expected to conduct yourself in a professional manner at all times.   This behavior is unacceptable. . . .

> Consider this letter as your final notice.   The behavior that you exhibited on March 1, 2008 will not be tolerated and any future infraction of this nature will result in disciplinary action up to and including immediate termination of employment.

Pl. Dep. Ex. 11.

Hertz asserts that during the investigation, Assaturian neither mentioned any disability nor requested any accommodation in connection with his

inappropriate behavior and final warning.   Tison Decl. ¶ 13.   According to

Assaturian, during the March 1, 2008 incident, he "was angry" and had "a loud

argument with an employee."   He claims that the incident "occurred due to my

irritability and inability to control my emotions and anger, which I was able to

control during the period of time I brought my small dog to work."   Pl. Decl. ¶ 23.

In May 2010, Assaturian and his wife bought a Shih Tzu named Sugar

Bear.   Assaturian ordered a "service animal" card thinking that it would enable him

to bring Sugar Bear to public places.   Pl. Dep. Tr. 107-120 & Ex. 16.   Sometime

during late 2010, he began bringing Sugar Bear to work, which he continued to do

for about a year.   According to co-workers, Sugar Bear was kept off-leash and

urinated on the floor, even though Assaturian kept a pad on the floor for him to

urinate on.   Walsh Decl. ¶ 9.   Assaturian did not request permission from Hertz or

inform his off-site supervisors that he was bringing Sugar Bear to work.

According to Assaturian, "I could control my emotions and

work-related stress with my dog around me," and "[e]mployees remarked how the

dog had a positive effect on my mood and emotions – that it calmed me."   Pl. Decl.

¶¶ 13.

## II.  Purported Request for Accommodation and Termination

In mid-November 2011, Tison learned that Assaturian had been bringing Sugar Bear to work without permission.  She was contacted by John Frank, Assaturian's immediate supervisor, who told her that John McNellis, Hertz's General Manager of Marketing Operations, had visited the Honolulu Car Sales facility while on vacation and seen a dog on the premises.  Tison Decl. ¶ 15. According to McNellis,

> I was surprised to see a dog running around unleashed in the office and went into Plaintiff's office to speak with him. Plaintiff was not in his office at the time, but I saw that there was a small kennel in Plaintiff's office and dog toys on the ground, so I assumed that the dog must be Plaintiff's.  Plaintiff then came into the office and confirmed that the dog was his, but we did not have any further discussion about the dog.
> . . . .
> Plaintiff never spoke with me either before or after I became his supervisor about permission to bring a dog to work.  Nor did Plaintiff ever explain to me that he had a medical condition or disability, much less describe a medical condition or disability for which he needed to have a dog at work, or for which he needed any other accommodation.  I was not aware that Plaintiff claimed to have a disability of ulcerative colitis and ulcerative proctitis until after Plaintiff filed his EEOC Charge against Hertz alleging disability discrimination.

McNellis Decl. ¶¶ 4, 6.

On November 17, 2011, Tison called Assaturian to discuss the dog at work.  Tison claims that Assaturian "began to yell at me and would not let me speak

and he hung up the telephone on me.   I informed him that Hertz had concerns with

allowing employees to bring their pets to work.   Plaintiff again became upset and

said that he was 'sick and tired of Hertz telling me what I can and can't do.'   Again,

Plaintiff hung up on me, requiring me to call him back."   Tison Decl. ¶ 16.

According to Tison,

> [w]hen he let me speak again, I told him that he would not be
> able to bring the dog back to work until he provided medical
> documentation that supported his needing to have the dog at
> work.   Plaintiff hung up on me a couple more times during the
> course of this conversation and Plaintiff also used profane
> language while yelling at me.   Plaintiff never mentioned during
> the course of this conversation about bringing his dog to work
> that he had a disability of ulcerative colitis or ulcerative proctitis,
> nor did he explain any disability that he had.   Nor did he explain
> that bringing the dog to work was related to any alleged
> disability or health condition.   Due to Plaintiff's yelling and
> repeatedly hanging up on me, I did not have a chance to fully
> explain Hertz' position , which was that Plaintiff would need to
> provide a doctor's note that supported that Plaintiff needed to
> bring the dog to work as an accommodation for a disability.

Tison Decl. ¶ 16.

> Later that same day, Assaturian sent Tison the following email:

> First I need to apologize to you for blowing up.   Anytime
> something seems unreasonable to me I tend to overact and
> apparently I am not in as much control as I thought.   I am in the
> process of contacting my personal physician who I will ask to
> recommend a specialist for me to see.   I did see someone years
> ago, but I do not remember their name.   I will keep you advised.
> Sorry for causing extra work.

Pl.' Dep. Ex. 20.   In Assaturian's recounting of the conversation with Tison, he claims that when she asked him if he had any paperwork allowing him to bring Sugar Bear to work, he told her "that I did have a service animal card.   I believed on information provided by my therapist that the service animal card was sufficient to permit me to bring the dog to work, which is a place of public accommodation."   Pl. Decl. 16.

> I also told Tison that the dog helped with my "anger issues", and that my therapist recommended I continue to bring the dog given the benefits to my "medical condition."
>
> Tison then said she would not permit the dog at the dealership, unless I got a "certificate" or "prescription" from a doctor even though I told her Sugar Bear helped control my "emotions" and "anger."

Pl. Decl. ¶¶ 17-18.[1]   According to Assaturian,

> I thought my service animal card was sufficient to keep bringing the dog to work, a public place.   I was confused and thought Tison's final decision was that I could not bring the dog to the Hertz dealership under any condition, since I already informed her that I had the card.   Tison never provided any form for me or

---

[1]Although Assaturian's Declaration states that he told Tison that his "therapist recommended I continue to bring the dog" into work, he stated at deposition that the first time he spoke to his therapist about bringing Sugar Bear to work was after his November 17, 2011 conversation with Tison.   *Cf.* Pl.' Decl. ¶ 17 and Pl. Dep. Tr. 172-75, Ex. 23.   When asked at deposition if he recalled any time before the discussion with Tison in which his therapist recommended that he bring the dog to work, Assaturian testified "No, I don't think there was a prior time I talked to him."   Pl. Dep. 175.

> my physician to complete. I remained open to any other
> suggestions Hertz might have to help me with my disabilities,
> but Defendant made none even though I repeated to Tison in
> December 2011, that I was under medical care for a disability.

Pl. Decl. ¶ 19.

Following the November 17, 2011 conversation with Tison, Assaturian did not follow up with her or give her any documentation supporting his request to keep Sugar Bear at work. At his deposition, Assaturian testified that Hertz had asked him to provide documentation, but he "did not have an opportunity to get there." Pl. Dep. 167. When asked why he had not provided any documentation from his therapist, he testified "I didn't realize that I needed to do that." Pl. Dep. 168. At a December 21, 2011 session with his therapist, Dustin Teruya, Assaturian discussed Sugar Bear's role in helping him improve his social and marital relationships, but did not address bringing the dog to work. When asked why he did not discuss having Sugar Bear at work with his therapist at that meeting, Assaturian testified:

> Q. So here is another time you discussed the dog with
> your therapist, but didn't ask about providing any
> documentation for you to bring the dog to work, right?
>
> A. Yes.
>
> Q. And again, you just didn't get around to asking
> him?

> A.   That is correct.

Pl. Dep. Tr. 174.   When asked about later discussions regarding the dog with his therapist, Assaturian repeated that "I had – I just had not gotten around to it."   Pl. Dep. 173.

> Q.   So you talked with him about the dog you just didn't get around to asking him for any documentation.
>
> A.   Yes, I did not ask him.
>
> Q.   Okay.   Did you ask any other medical provider?
>
> A.   No, not yet.
>
> Q.   Did you ever ask any other medical provider while you were employed at Hertz?
>
> A.   No.   I did not have the opportunity before I was terminated.

Pl. Dep. 173.

Assaturian was terminated on March 14, 2012 following an incident with a subordinate.   Assaturian claims that no reason was given for his termination. Pl. Decl. ¶ 23.   According to Hertz, on March 9, 2012, Bill Bryan complained to management that Assaturian had yelled at him and suspended him from work. Bryan sent an email to Tison and McNellis stating that, following a workplace disagreement in which Assaturian yelled and pounded on the edge of Bryan's desk,

Assaturian followed him out of his office shouting "You are being insubordinate; get your ass back into this office!" Tison Decl. ¶ 20. Tison and McNellis conducted an investigation, interviewing Bryan, Assaturian, and co-workers present during the incident. Tison Decl. ¶¶ 21-24. In a written statement, Assaturian acknowledged yelling loudly at Bryan. Ex. J. Following a telephone call with Assaturian, McNellis informed Assaturian that he was suspended pending further investigation. According to Tison and McNellis, during this telephone conference and the rest of the investigation of Bryan's complaint, Assaturian never provided any information about any disability or medical condition and did not make any request for a reasonable accommodation. Tison Decl. ¶ 23; McNellis Decl. ¶¶ 6, 9.

Following the investigation, McNellis decided to terminate Assaturian, and the decision was approved by the Human Resources Department and McNellis' manager, Jeff Adams. Tison Decl. ¶ 25. McNellis states that he reached this decision based on "the investigation of these incidents, and information Ms. Tison provided regarding serious discipline that Plaintiff had received for a prior angry outburst at a subordinate." McNellis Decl. ¶ 11. McNellis traveled to Honolulu to meet with Assaturian in person. According to McNellis,

> At the outset of the meeting, I offered Plaintiff the opportunity to resign in lieu of termination, but he declined to do so. I then explained the recent investigation of the incident that had

occurred involving Plaintiff's conduct towards Mr. Bryan and informed him of the decision to terminate his employment effective immediately. Plaintiff then pulled out a note from which he read a statement, "Are you sure you don't want to reconsider because of my medical condition and age?" Plaintiff did not explain what he meant or specify any particular medical condition that he was referring to. Since Plaintiff's age and unknown medical condition were not a reason for the termination decision, I told him that I would not reconsider the decision. There was no other discussion other than that we would arrange to have Plaintiff's items in his office delivered to him.

McNellis Decl. ¶ 12.

In his Declaration, Assaturian denies "using profanity during the argument with the employee, but I did lose my temper, which I never did when I had my dog around at work." Pl. Decl. ¶ 22. He also states,

I understand that McNellis also considered a write up I received in March 2008, four years earlier, as part of the decision to terminate me. In that incident I was angry and had another loud argument with an employee. These incidents occurred due to my irritability and inability to control my emotions and anger, which I was able to control during the period of time I brought my small dog to work.

Pl. Decl. ¶ 23.

Following his termination, Assaturian claims that he was "too embarrassed to socialize, to go outside the house and to apply for a job, especially with my medical conditions. I planned on retiring from Hertz when I reached the

age of 70." Pl. Decl. ¶ 27. Assaturian did not apply for any jobs following his termination, but continued to do work as an independent contractor for Pearlridge Realty, which he had also done while employed at Hertz. Pl. Dep. 187-95. He also acknowledged that, since his termination, his stress has decreased. Pl. Dep. 198.

III. __Assaturian's Claims and Hertz's After-Acquired Evidence__

Assaturian filed his complaint in state court on May 6, 2013 alleging disability discrimination and retaliation: Count I alleges that Hertz violated Hawaii Revised Statutes ("HRS") § 378-2(a)(1)(A) and Count II alleges violations of HRS § 378-2(a)(2). Hertz removed the complaint to this Court on June 14, 2013.

During the course of the litigation, Hertz learned of other alleged misconduct by Assaturian during the course of his employment. Tison discovered that, among other things, Assaturian had instructed his subordinate to shred documents to avoid their discovery during a Hertz internal audit, inaccurately reported employee attendance, violated Hertz's compensation plan, and engaged in inappropriate outbursts at several other subordinates. Tison Decl. ¶¶ 23-36. According to Tison, this conduct would have resulted in Assaturian's termination if he had still been employed there in January 2014. Tison Decl. ¶ 37. Assaturian denies some of the alleged misconduct, including shredding documents, instructing

13

others to falsify time records, failing to report an accident, violating the company compensation plan, and improperly instructing a subordinate to remove markings on a car.   Pl. Decl. ¶¶ 24-26.

Hertz seeks summary judgment on both Counts in the complaint. Alternatively, Hertz seeks summary judgment on several of Assaturian's requested remedies.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## DISCUSSION

## I.    Summary Judgment Is Denied as to Count I

Assaturian alleges that Hertz violated HRS § 378-2(a)(1)(A) because it (1) terminated him on the basis of his disability, and (2) failed to reasonably accommodate his disabilities and engage in an interactive process in good faith. Complaint ¶¶ 14, 31-33.

**A.** **Questions of Fact Preclude Summary Judgment on Assaturian's Termination Claim**

HRS § 378-2(a)(1)(A) makes it an unlawful discriminatory practice "for any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of a person's disability. "[B]ecause the definitions of disability in the [Americans With Disabilities Act ("ADA")] and HRS § 378–2 are substantially identical, the Hawaii Supreme Court has expressly adopted the [ADA] analysis for establishing a prima facie case of disability discrimination under HRS § 378-2, and looks 'to the interpretations of analogous federal laws by the federal courts for guidance.'" *Thorn v. BAE Sys. Haw. Shipyards, Inc.,* 586 F. Supp. 2d 1213, 1219 (D. Haw. 2008) (citing *French v. Hawaii Pizza Hut, Inc*., 105 Hawai'i 462, 467, 99 P.3d 1046, 1050 (2004)).

The Court applies the burden-shifting analysis derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to claims of discrimination on account of a disability. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 (2003). Under this burden-shifting analysis, in order to establish a prima facie claim of disability discrimination, Assaturian must put forth evidence that he:

(1) is "disabled" within the meaning of the statute; (2) is a "qualified individual" (that is, he is able to perform the essential functions of his job, with or without reasonable accommodations); and (3) suffered an adverse employment action because of his disability. *See, e.g., Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, 1237 (9th Cir. 2012) (citing 42 U.S.C. § 12112(a), (b)(5)(A) (requiring reasonable accommodation)). "At the summary judgment stage, the 'requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co*., 26 F.3d 885, 889 (9th Cir. 1994)).

If Assaturian establishes a prima facie case, the burden then shifts to Hertz to articulate a legitimate, nondiscriminatory reason for its employment action. *Raytheon*, 540 U.S. at 49 n.3. If Hertz proffers such a reason, "the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Id.* (citation omitted).

For purposes of summary judgment, Hertz does not dispute that Assaturian's alleged conditions constitute a disability under Hawaii law. *See* Reply at 10. Hertz argues that it is entitled to summary judgment because Assaturian was

16

not terminated because of any disability, and because it had no notice of any disability. Assaturian contends that Hertz did have notice and that the March 9, 2012 incident that preceded his termination was directly related to his disability.

The Court first finds that genuine issues of material fact exist with respect to whether decisionmakers at Hertz knew of Assaturian's disabilities. According to Tison and McNellis, Assaturian never told them of any disability or medical condition prior to his termination. Tison Decl. ¶¶ 14, 17, 19; McNellis Decl. ¶¶ 6, 12. Assaturian, on the other hand, claims that during the November 17, 2011 discussion regarding bringing Sugar Bear into the office, he told Tison that the dog helped with his "anger issues," "emotions," and "medical condition." Pl. Decl. ¶¶ 16-18. He further claims that he "repeated to Tison in December 2011, that I was under medical care for a disability." Pl. Decl. ¶ 20. Viewing the record in the light most favorable to Assaturian, there is a question of fact regarding whether the decisionmakers at Hertz had notice of his disabilities, and accordingly, whether Assaturian satisfies the elements of his prima facie case.

Hertz contends that it terminated Assaturian based on legitimate, non-discriminatory reasons, *i.e.*, the 2008 and March 2012 incidents involving inappropriate angry outbursts directed toward his subordinates. Assaturian argues that these reasons are pretextual because the conduct that purportedly led to his

17

termination was caused by his disability, and because similarly situated employees were not terminated for abusive behavior towards their subordinates. According to Assaturian, his supervisor, McNellis "had several complaints made against him for being verbally abusive towards employees and for which McNellis' supervisor, Al Blazquez, did nothing about." Pl. Decl. ¶ 21; Pl. Dep. 150-55. Assaturian does not elaborate on how McNellis is similarly situated or the specifics of the alleged incidents. If, however, a reasonable juror could find that Hertz's decisionmakers knew of his disabilities, and that these decisionmakers nonetheless terminated him for conduct that was symptomatic of his disability, Assaturian could arguably succeed on his claim for unlawful termination. *See Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1094 (9th Cir. 2007) (holding that an employer may not terminate a disabled employee for "conduct resulting from" the employee's disability because such conduct is part and parcel of the disability itself); *id.* at 1095 ("Gambini was therefore entitled to have the jury instructed that if it found that her conduct at issue was caused by or was part of her disability, it could then find that one of the 'substantial reasons' she was fired was her bipolar condition."). Although the issue is a close one, the Court must view the record in the light most favorable to and draw all reasonable inferences in favor of Assaturian. Accordingly, the Court finds that questions of fact exist with respect to whether

Assaturian was terminated because of his disability, and the Motion is DENIED as to this issue.

**B.     Questions of Fact Preclude Summary Judgment on Assaturian's Reasonable Accommodation and Interactive Process Claim**

The Court next turns to Assaturian's claims relating to reasonable accommodation and the interactive process.   Hertz argues that Assaturian "merely made a request to be allowed to keep bringing his dog to work," and did not make a proper request for a reasonable accommodation.   Mem. in Supp. of Motion at 24. Assaturian insists that Hertz was "on notice that he required reasonable accommodation due to a medical condition."   Mem. in Opp. at 14.

> Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of an individual with a disability that is known to the employer.   Thus, an employer would not be expected to accommodate disabilities of which it is unaware.   If an employee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation.   In general, however, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.   When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation.

29 C.F.R. Pt. 1630 Appx. at 403.

Here, the record is inconclusive with respect to what Hertz knew about Assaturian's disability and whether having Sugar Bear at work would be a reasonable accommodation. There are conflicting facts regarding the scope of Hertz' knowledge, and role of the parties in engaging in the interactive process. For example, Tison claims that during the November 17, 2011 telephone calls, Assaturian "never mentioned during the course of this conversation about bringing his dog to work that he had a disability of ulcerative colitis or ulcerative proctitis, nor did he explain any disability that he had. Nor did he explain that bringing the dog to work was related to any alleged disability or health condition." Tison Decl. ¶ 16.

Assaturian claims that when Tison asked him if he had any paperwork allowing him to bring Sugar Bear to work, he told her that he had "a service animal card" and that Sugar Bear helped with his "anger issues," and "helped control [his] 'emotions' and 'anger.'" Pl. Decl. ¶¶ 16-18. Assaturian also claims that bringing Sugar Bear to work helped him to control his emotions, and that he did not have any workplace incidents during the period of time he brought the dog to the office. Pl. Decl. ¶ 23. Hertz counters that Sugar Bear did not help Assaturian complete the duties of his position, and that Assaturian cannot establish that bringing Sugar Bear to work was a reasonable accommodation. Viewing the record in the light most favorable to Assaturian, there are questions of fact regarding whether he requested to

bring Sugar Bear to work as an accommodation, and if he had, whether the request was reasonable.

Assaturian also claims that Hertz failed to engage in the interactive process in good faith. "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (citing *Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), vacated on other grounds, 535 U.S. 391 (2002)); *see also* 29 C.F.R. § 1603.2(o)(3) (explaining that the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations"); 29 C.F.R. Pt. 1630 Appx. at 403 ("Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability.").

An employer who fails in good faith to engage in an interactive process is liable "if a reasonable accommodation without undue hardship to the employer

would otherwise have been possible." *Humphrey*, 239 F.3d at 1139. And, an employer who fails to engage in an interactive process in good faith is not entitled to summary judgment unless "a reasonable finder of fact must conclude that 'there would in any event have been no reasonable accommodation available.'" *Dark v, Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006) (quoting *Morton v. United Parcel Serv., Inc.*, 272 F.3d 1249, 1256 (9th Cir. 2001), overruled on other grounds by *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007)).

As with the issues previously discussed, questions of fact preclude the entry of summary judgment on this claim. Based on the current disputed record, it is unclear whether and when the parties' obligations to engage in the interactive process were triggered, and whether either side satisfied their obligations thereunder. Assuming for purposes of discussion that Assaturian sufficiently initiated the interactive process by notifying Tison that he needed a reasonable accommodation for a disability, it is not clear that Hertz made a reasonable effort to determine an appropriate accommodation. There is no dispute that Tison told Assaturian that some form of documentation was required to bring Sugar Bear to work and that Assaturian failed to provide any paperwork or follow up further. It is not clear what Hertz did to follow up with Assaturian or to discuss alternative arrangements. Questions of fact abound. For example, Assaturian claims that,

I was confused and thought Tison's final decision was that I could not bring the dog to the Hertz dealership under any condition, since I already informed her that I had the card. Tison never provided any form for me or my physician to complete. I remained open to any other suggestions Hertz might have to help me with my disabilities, but Defendant made none even though I repeated to Tison in December 2011, that I was under medical care for a disability.

Pl. Decl. ¶ 19. It is clear that Assaturian himself did not further engage in the interactive process or revisit the issue of bringing Sugar Bear to work, which he now claims would have been a reasonable accommodation. Nor apparently did he raise the issue with his therapist during this period. *See* Pl. Dep. Tr. 174.

> Q. So you talked with him about the dog you just didn't get around to asking him for any documentation.

> A. Yes, I did not ask him.

> Q. Okay. Did you ask any other medical provider?

> A. No, not yet.

> Q. Did you ever ask any other medical provider while you were employed at Hertz?

> A. No. I did not have the opportunity before I was terminated.

Pl. Dep. 173.

Thus, it appears that neither side fully participated in the interactive process, if indeed, it had been triggered. A reasonable factfinder could conclude

that Assaturian was in a superior position to propose an alternative accommodation and to provide documentation to support his request to bring Sugar Bear to work. *See Allen v. Pac. Bell*, 348 F.3d 1113 (9th Cir. 2003); *Dunlap v. Liberty Natural Prods., Inc.,* 2013 WL 6177855, at \*7-\*8 (D. Or. Nov. 25, 2013).

On the other hand, Hertz has not established as a matter of law that it "did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Waterbury v. United Parcel Serv*., 2014 WL 325326, at \*8 (E.D. Cal. Jan. 28, 2014) (citations omitted); *see also Bower v. City & County of San Francisco*, 2011 WL 569882, at \*7 (N.D. Cal. Feb.14, 2011) (granting summary judgment for defendant on failure to accommodate claim under ADA when plaintiff "was specifically provided with a Reasonable Accommodation request form and he declined to fill it out"); *Houston v. Regents of Univ. of Cal*., 2006 WL 1141238, at \*31 (N.D. Cal. May 1, 2006) (granting summary judgment on failure to accommodate and failure to engage in interactive process claims when defendant made multiple steps to engage in interactive process but plaintiff failed to respond to requests for documentation).

In light of the conflicting record, the Court concludes that issues of fact preclude summary judgment on this claim.   The Motion is DENIED as to Count I.

## II.     Summary Judgment Is Granted As to Count II

Assaturian concedes that Hertz is entitled to summary judgment on

Count II.   For the reasons set forth in the Motion, and Assaturian's non-opposition,

the Motion is GRANTED as to Count II's claim for retaliation.

## III.    Summary Judgment Regarding Damages Issues

Hertz moves for summary judgment on several of Assaturian's

requested remedies, including front and back pay, emotional distress damages, and

punitive damages.   It also argues that its after-acquired evidence of Assaturian's

misconduct should preclude recovery of damages after the middle of January 2014.

The Court addresses each of these remedies in turn.

### A.     Back and Front Pay

A plaintiff has a duty to make every reasonable effort to mitigate his or

her damages.   *See Malani v. Clapp*, 56 Haw. 507, 517, 542 P.2d 1265, 1271 (1975).

However, an employee is not obligated to accept a position that is not consonant

with his particular skills, background, or experiences.   *Vieira v. Robert's Hawaii

Tours, Inc*., 2 Haw. App. 237, 630 P.2d 120 (1981) (explaining the general rule that

the employee need not accept a different or inferior job for purposes of mitigation).

While a plaintiff has a duty to use reasonable diligence in finding other suitable

employment, the employer has the burden of proving the plaintiff's failure to

mitigate damages. *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995); *see also Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978) ("To satisfy this burden, defendant must establish (1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position.").

Assaturian admits that he made no effort to find employment after he was terminated, aside from continuing to work as a contract employee for Pearlridge Realty. Nor has he rebutted Hertz's showing that substantially equivalent car sales management jobs were available, and that he failed to use diligence, reasonable or otherwise, in seeking one. *See* Tison Decl. ¶ 38, Ex. M. Assaturian only speculates that his job search would likely have been futile due to his age and circumstances. The Court concludes that Assaturian has fallen short of his duty to use reasonable diligence in finding other suitable employment. *Odima*, 53 F.3d at 1497. Accordingly, as a result of Assaturian's undisputed failure to mitigate damages, Hertz is entitled to summary judgment on Assaturian's requests for back and front pay, including any associated lost benefits.

### B. Emotional Distress Damages

According to Assaturian, he felt decreased emotional distress after he was terminated, and stopped seeing his therapist in March 2012. Pl. Dep. 173-98, Exs. 23 & 30. During a June 6, 2013 physical exam, Assaturian reported that he felt well, his ulcerative colitis was in remission, he worked part-time for a real estate company and experienced no stress. Pl. Dep. Ex. 34. He also indicated that there were no health conditions that interfered with his daily activities. *Id.* At his deposition, Assaturian confirmed that the June 6, 2013 exam was an accurate representation of his health and that he answered the questions accurately. Pl. Dep. at 200-01.

Assaturian did not provide any evidence to the contrary or argument in opposition to the Motion on this point. Notably, Assaturian has not indicated that he felt any sort of emotional distress for which damages are warranted after June 6, 2013. Accordingly, because Hertz has met its burden on summary judgment, the Court limits Assaturian's damages for emotional distress up to the period ending on June 6, 2013.

### C. Punitive Damages

Punitive damages are available in employment discrimination cases. *Hale v. Hawaii Publications, Inc*., 468 F. Supp. 2d 1210, 1233-34 (D. Haw. 2006).

Under Hawaii law, punitive damages are permitted when the plaintiff shows "by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some willful misconduct or entire want of care which would raise the presumption of a conscious indifference to the consequences." *Kahale v. ADT Auto. Servs., Inc.*, 2 F. Supp. 2d 1295, 1303 (D. Haw. 1998) (quoting *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 16–17, 780 P.2d 566, 575 (1989)).

Hertz argues that there is no evidence that it acted egregiously or with a conscious indifference to the consequences. The Court, however, concludes that questions of fact exist regarding the circumstances of Assaturian's termination, Hertz's failure to provide a reasonable accommodation, and the parties' interactive exchange. Because such issues of fact exist, Assaturian's prayer for punitive damages will remain at this time.

### D. <u>Damages Based on After-Acquired Evidence</u>

Hertz asks the Court to bar the recovery of damages based on after-acquired evidence. Hertz asserts that it would have fired Assaturian by the middle of January 2014 based on its discovery of rampant wrongful conduct that it first learned of during the course of this litigation. Assaturian denies the majority

of this conduct in his Declaration. Although Assaturian's denial is conclusory in part and specific as to some of the alleged acts, the Court must view the evidence in the light most favorable to the non-moving party. Accordingly, the Court finds that questions of fact exist regarding the facts and circumstances underlying the events detailed by Hertz as after-acquired evidence, including whether any or all of the various events would have independently from one another caused Hertz to terminate Assaturian. The Motion is DENIED as to this issue.

## CONCLUSION

On the basis of the foregoing, the Court GRANTS the Motion for Summary Judgment with respect to Count II, and Hertz's request to limit damages (1) for back and front pay, and (2) for emotional distress damages after June 6, 2013. The Motion is DENIED in all other respects.

IT IS SO ORDERED.

Dated: September 2, 2014 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

John Assaturian v. Hertz Corporation, et al.; Civ. No. 13-00299 DKW-KSC; **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT THE HERTZ CORPORATION'S MOTION FOR SUMMARY JUDGMENT**